UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:21-cr-00228 NODJ BAM |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO DISMISS |
| v. | |
| BENJAMIN JOHN MARTIN, | (Docs. 75, 76) |
| Defendant. | |

Benjamin Martin was identified by FBI agents as being present at and in the United States Capitol Building on January 6, 2021, during the riots occurring in and around that building. Consequently, the Court issued a warrant to search Martin's home and to seize items related to his travel to and conduct at the Capitol. Because of the search, Martin was charged with a violation of 18 U.S.C. § 922(g)(9). (Doc. 11)

He now moves the Court to suppress the firearms that the government seized from his home. (Doc. 75) In addition, Mr. Martin contends that the action should be dismissed because 18 USC § 922(g)(9) is unconstitutional. Because the Court determines the officers had probable cause to seize the firearms and because the Court finds § 922(g)(9) is constitutional, the motions are **DENIED**.

**I.      Factual Background**

Before the officers searched Martin's home, they were aware that he was precluded from

possessing firearms and planned to obtain a rollover warrant if they found any such weapons. (Doc. 80-2 at 1-2) During the search, the agents found items in Martin's closet consistent with gun ownership, including "a Benelli gun case, a pistol case, paperwork confirming Martin's purchase of a Benelli shotgun and two firearm stocks/lower receivers." *Id.* at 2. The agents also found a locked gun safe in Martin's garage. *Id*. The agents decided to search the safe because due to its size, items covered by the search warrant could be found inside. *Id*. In the safe, the agents found firearms, including four rifles, two shotguns, including a Benelli 12-gauge shotgun, an assault rifle, a Kimber 1911 pistol, Martin's passport, a birth certificate for Martin's son, and a vehicle title in Martin's name, among other documents. (Doc. 76-1 at 8-9) Because the agents understood that Martin was prohibited under federal law from possessing firearms, they removed the firearms from the safe and began processing the firearms as evidence. (Doc. 80-2 at 2) The agents examined the Benelli shotgun and the Kimber pistol to gather relevant information to assist in verifying that they were manufactured outside of California. (Doc. 75 at 4-5)

   In the meanwhile, in consultation with the United States Attorney's Offices in the District of Columbia and the Eastern District of California, the FBI agent sought an opinion from an agent from the Bureau of Alcohol, Tobacco and Firearms as to the location of manufacture for the Benelli shotgun and the Kimber pistol, using the information gained from examining them. (Doc. 80-2 at 2) The ATF agent opined that the weapons were manufactured outside of California. *Id*.

   In the affidavit supporting the issuance of a rollover warrant, the agent reported this information and that Martin had suffered "a 2018 domestic violence-related misdemeanor battery conviction in the Superior Court of Fresno County with Case Number Fl8901304. As a result of that conviction, MARTIN was placed on probation through January 10, 2022, with a condition that he not possess firearms. A further review of MARTIN's criminal history showed that he is also subject to a temporary restraining order that prohibits him from possessing firearms." (Doc. 76-1 at 9) The Court issued a search warrant allowing the seizure of firearms, magazines, ammunition, firearms stocks and evidence of ownership and possession of firearms and ammunition. *Id*. at 2-15. Consequently, the agents seized the pistol, the rifles, the AR-15, ammunition, magazines, including five, high-capacity magazines, in addition to sites, scopes and

1  other firearm equipment and the receipt indicating that the defendant purchased the Benelli
2  shotgun. (Search Warrant Return in case number 1:21-sw-00292 EPG)
3  Following the seizure, Martin was arrested on a warrant issued with a criminal complaint
4  charging him with a violation of 18 U.S.C. § 922(g)(9). (Doc. 1) The grand jury indicted Martin
5  on this charge soon thereafter and the indictment alleged that he was in possession of the Benelli
6  shotgun, the Kimber pistol and "one round of Santa Barbara 7.62 X 51 mm ammunition." (Doc.
7  11)

8  **II.     MOTION TO SUPPRESS**

9  The Fourth Amendment states, "(t)he right of the people to be secure in their persons,
10 houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."
11 U.S. Const. amend. IV. A "search" occurs for purposes of the Fourth Amendment if the police
12 seek information by intruding on a person's reasonable expectation of privacy or by means of
13 trespassing upon one's person, house, papers, or effects. *See Florida v. Jardines*, 569 U.S. 1, 5
14 (2013); *United States v. Jones*, 565 U.S. 400, 408 n.5; *El-Nahal v. Yassky*, 835 F.3d 248, 253–54
15 (2d Cir. 2016).

16 The law is established that when officers encounter evidence of a new crime during the
17 execution of a search warrant, they may seize the evidence under the plain view doctrine if the
18 items are "immediately incriminating." *Horton v. California*, 496 U.S. 128, 133, 142 (1990).
19 The question raised in this motion is whether the officers could seize the firearms despite that
20 they could not be certain whether the firearms had traveled in interstate commerce without
21 picking them up and examining them.

22 There is no dispute that the firearms at issue were within plain view once the officers
23 opened the gun safe nor that they were entitled to open the safe under the terms of the original
24 search warrant. At the time the agents removed the firearms from the gun safe, they "understood"
25 that the firearms represented evidence of a federal crime (Doc. 80-2 at 2) and the opinion of the
26 ATF agent, confirmed their understanding. This is sufficient. "By requiring that the incriminatory
27 nature of the evidence be "immediately apparent," the doctrine does not require that the officer
28 "be possessed of near certainty as to the seizable nature of the items." *United States v. Hudson*,

100 F.3d 1409, 1420 (9th Cir. 1996) quoting *Texas v. Brown*, 460 U.S. 730, 741, (1983). "Instead, probable cause "is a flexible, common-sense standard," requiring only that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband ... or useful evidence of a crime." *Id*. at 741–42, 103 S.Ct. at 1543 (*quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925))." *Hudson* at 1420 (9th Cir. 1996).[1] Thus, the fact that the officers were not certain that the firearms had traveled in interstate commerce when they opened the safe, does not mean that they could not seize the firearms.

In addition, the subsequent search warrant was supported by probable cause to seize the firearms. The Fourth Amendment requires that the search warrant be based on "probable cause, supported by Oath or affirmation[.]" U.S. Const. amend. IV. Thus, there must be probable cause to believe the evidence sought would assist in finding or convicting a particular defendant for a particular offense. *Bill v. Brewer*, 799 F.3d 1295, 1300 (9th Cir. 2015) (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)). The issuing judge need only find under "'the circumstances set forth in the affidavit before him...a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 240 (1983), 462 U.S. at 238); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967). As noted above, the affidavit reported the key facts upon which the court could determine that Martin had committed a crime and that the items to be seized would assist in the prosecution of that crime. This is sufficient.

An accused person may move to suppress evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. *See, e.g., United States v. Calandra*, 414 U.S. 338, 341 (1974); Fed. R. Crim. P. 41(h). When deciding a motion to suppress, courts first determine whether a Fourth Amendment violation occurred, and then

---

[1] On the other hand, a "seizure" of personal property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interests in that property. *See United States v. Jacobsen*, 466 U.S. 109, 113, (1984); *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). Merely picking up the firearms to gather information needed to rule out that they had been manufactured in the state, did not meaningfully interfere with Martin's possessory interests.

4

1 whether suppression is appropriate. *See Davis v. United States*, 564 U.S. 229, 236–39 (2011). The
2 burden is on the accused to show that their Fourth Amendment rights were violated by the
3 challenged search or seizure to have standing to challenge the admission of evidence. *Simmons v.*
4 *United States*, 390 U.S. 377, 389–90 (1968). Because the Court does not find that Martin's Fourth
5 Amendment rights were violated, the motion to suppress is **DENIED**.

      **A.**      **No *Franks* hearing is warranted**

7       Mr. Martin seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).
8 He argues that the affiant for the rollover warrant recklessly failed to indicate in the affidavit that
9 the "other firearms may have been made in California" such that "it encouraged the U.S.
10 Magistrate Judge to permit the seizure of evidence without probable cause for a federal crime."
11 (Doc. 75 at 7) However, the affidavit expressly noted the firearms and ammunition found in the
12 gun safe and asserted only that the Benelli shotgun and the Kimber pistol were manufactured
13 outside of California. (Doc. 76-1 at 8-9) The affiant made no representations about the origin of
14 the four rifles or the assault rifle. *Id*. at 8. The Court finds that the failure of the affiant to state
15 that he did not know the origin of the rifles or the assault rifle was neither false nor misleading.
16 Likewise, there is no showing that this omission was necessary to the finding of probable cause.
17 Consequently, no *Franks* hearing is warranted, and the request is **DENIED**.

18 **III.**    **MOTION TO DISMISS**

19       The United States Supreme Court has determined that the Second Amendment protects
20 the "individual right to keep and bear arms for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc.*
21 *v. Bruen*, 597 U.S. 1, 17 (2022). Martin contends that the indictment should be dismissed because
22 it funs afoul of the Second Amendment. Martin argues that, under *Bruen*, "When the Second
23 Amendment's plain text covers an individual's conduct, the Constitution presumptively protects
24 that conduct. The government must then justify its regulation by demonstrating that it is
25 consistent with this Nation's historical tradition of firearm regulation. *Id*. at 24. There is no
26 dispute that the firearms at issue were in Martin's home and no dispute that except for §
27 922(g)(9), he would be entitled to possess a firearm for any lawful purpose. Thus, Martin argues
28 that because the government has failed to demonstrate a sufficiently analogous historical

analogue for disarming those who engage in acts of spousal battery, which were prosecuted as misdemeanors, § 922(g)(9) is unconstitutional. The Court disagrees.

The parties agree that "[o]n the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, at 30. Where they don't agree is the similarity between § 922(g)(9)'s provisions and the circumstances under which our history disarmed people.[2]

As the government points out, courts across the nation have considered the constitutionality of § 922(g) and it cites to many of those cases. (Doc. 79 at 8) For example, in *United States v. Jackson*, 622 F. Supp. 3d 1063, 1066–67 (W.D. Okla. 2022), the court observed,

> Section 922(g)(9) prohibits any person convicted of a "misdemeanor crime of domestic violence" as defined § 921(a)(33), from possessing a firearm, even for a lawful purpose such as self-defense. Because the Second Amendment presumptively protects the proscribed conduct, the government must establish that the statute is consistent with a historical tradition of firearm regulation. The government attempts to do so with broad arguments that do not address a history of firearm possession by domestic violence offenders. The government instead relies on restrictions historically imposed on felons and adopts the analogy to surety laws discussed in *Bruen. See* Suppl. Resp. Br. at 5-6.
>
> This approach is understandable. Legal scholars have commented on the paucity of evidence that American traditions reached within the home to interfere with domestic relationships, particularly the marital relationship. *See, e.g.*, Joseph Blocher, *Domestic Violence and the Home-Centric Second Amendment*, 27 Duke J. of Gender Law & Policy 45, 55-56 (2020) ("In the context of domestic violence prohibitions, the historical record is problematic to say the least."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin."). Indeed, in the United States, the common law recognized until the mid-1800's a "right of chastisement" that allowed husbands to inflict corporal punishment on their wives. *See* Blocher, *supra*, at 56 (citing Mary Anne Franks, *The Cult of the Constitution*, 77 (2018); Reva B. Siegel,

---

[2] The Court refers to "people" though, of course, historically any property a woman had at the time of her marriage became that of her husband. Reva B. Siegel, "*The Rule of Love*": *Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2122 (1996)). Thus, disarming women could not have been within the contemplation of the ordinary citizen at the making of our Constitution. Notably, as noted in *Jackson,* this law review article talks about the "right of chastisement" of a wife by her husband, which allowed the husband to beat his wife even if only to "gratify his own bad passions." Thus, clearly, history had a different view of what constitutes domestic violence than we have today.

*"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2121-41 (1996)).

Despite a desire for greater specificity, the Court finds that the government's reliance on general historical tradition is sufficient to satisfy its burden to justify the firearm regulation of § 922(g)(9). *Bruen* teaches that the "historical inquiry that courts must conduct will often involve reasoning by analogy" and "determining whether a historical regulation is proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 142 S. Ct. at 2132. The Court identified "two metrics" that would render regulations relevantly similar under the Second Amendment: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. If one accepts the dictum in *Heller* on which courts have repeatedly relied, a "longstanding prohibition" supported by historical tradition is one "on the possession of firearms by felons." *See Heller*, 554 U.S. at 626, 128 S.Ct. 2783. Domestic violence misdemeanants can logically be viewed as "relevantly similar to felons" who should be "denied weapons for the same reasons." *See* Blocher, *supra*, at 56. To be sure, if numerous nonviolent felony offenses carry the resultant prohibition on gun possession, it would be incongruous to give different treatment to misdemeanants convicted of a violent offense, including domestic violence.

Notably, the Supreme Court has repeatedly addressed the reach of § 922(g)(9) without questioning its constitutionality. Most recently, in *Voisine v. United States*, 579 U.S. 686, 692, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016), the Court held that the statute applies to a misdemeanant who was convicted under an assault statute that encompasses "reckless" conduct. In that case, Justice Thomas opined in dissent that the majority's construction of the statute rendered it unconstitutional, but no other justice joined this part of his opinion or endorsed this view. *See id.* at 715, 136 S.Ct. 2272 (Thomas, J. dissenting). Under the circumstances currently presented, where the effect of the Supreme Court's decision in *Bruen* on longstanding criminal prohibitions such as § 922(g) remains unclear, this Court declines to hold that § 922(g)(9) violates the Second Amendment.

Likewise, in *United States v. Donahue*, 2023 WL 4372706, at *3 (S.D. Tex. July 5, 2023), the court held,

> Here, an analogy can be drawn between Section 922(g)(9) and founding-era legislation that disarmed people who were deemed dangerous. The prohibition of possession of firearms by domestic violence misdemeanants, and other groups identified as dangerous, is supported by history. *See, e.g.*, Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1239 (2015) ("[H]istory suggests that when the legislature restricts the possession of firearms by discrete classes of individuals reasonably regarded as posing an elevated risk for firearms violence, prophylactic regulations of this character should be sustained."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (citing historical examples for the proposition that "any person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms.'").
> The historical record reflects significant regulation of firearms designed to ensure public safety and responsible gun ownership. In the founding era, firearms "could be required to be registered," gun owners could be required to undergo training, and the law could mandate storage requirements for "firearms and gun powder." *United States v. Nutter*, 624 F.Supp.3d 636, 641 (S.D. W. Va. 2022) (citing Adam Winkler, Heller's *Catch-22*, 56 UCLA L. Rev. 1551, 1562–63 (2009)). Finally, founding era laws prohibited bearing arms in a way that spread "fear" or "terror" among the people. *Bruen*, 597 U.S. at ––––, 142

S.Ct. at 2145. "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Nutter*, 624 F.Supp.3d at 643 (citing *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. ––––, 142 S.Ct. 2111 (Barrett, J., dissenting)). When Section 922(g)(9) was enacted, Congress deemed those convicted of domestic violence as dangerous, and "that conclusion is well supported by empirical evidence and statistics regarding domestic violence, recidivism by those convicted of misdemeanor crimes of domestic violence, and increased risks of serious harm and death posed when firearms are present in connection with domestic violence." *Id.* (citing *United States v. Staten*, 666 F.3d 154, 161–67 (4th Cir. 2011)). Therefore, through analogy, Section 922(g)(9) is consistent with the Nation's historical tradition of firearm regulation.

Because the Court agrees with the rationale of these cases and it can add little to the analysis offered by the courts analyzing the constitutionality of § 922(g)(9), the Court finds that § 922(g)(9) is not unconstitutional and the motion to dismiss is **DENIED**.

Notably, in issuing this ruling, the Court will not consider the declaration offered by Mr. Cramer and submitted with Martin's reply[3]. The defense has made no effort to meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 592, 593-94 (1993), in proffering this declaration. Because Mr. Cramer "does not show his work," there is no way for the Court to determine whether his methods have been or can be tested, and it amounts to "Trust me, I am an expert."

For example, Mr. Cramer omits reference, without explanation, to numerous criminal cases related to domestic violence cited in the law review articles cited here and, in the authorities quoted above.  There is no demonstration that Mr. Cramer's work has been peer-reviewed. The fact that his publications have been cited by judges is not the same thing as having them reviewed by his peers who are trained in the appropriate methodological study of history. Absent this type of review, the Court is left with no basis to understand the significance of Mr. Cramer's assertions or the quality or completeness of his research.

Indeed, Mr. Cramer does not provide a curriculum vitae and, instead, notes only that he has a "M.A. in History" and that he "teach[es] history at the College of Western Idaho." (Doc. 85-1 at 2) Though interesting, this fails to demonstrate that Mr. Cramer has sufficient qualification to

---

[3] Even if it considered Mr. Cramer's declaration, the outcome here would not change, because he does not address the findings of his peers set forth in the law review articles cited here, which demonstrate that domestic violence was largely ignored, considered to be best handled within the family or was addressed by the church.

meet the requirements of Federal Rules of Evidence 701 as to the relevant topic. The Court attempted to locate Mr. Cramer's qualifications by accessing the link he included in his declaration. The link directed the Court to a list of articles he has written and a link to his webpage, which provides information on a score of topics including homeschooling, personal finance, astrophotography and more. (Doc. 85-1 at 2) Thus, the Court received no further clarity as to Mr. Cramer's qualifications. For the reasons set forth, the declaration is disregarded.[4]

**Conclusion**

Accordingly, for the reasons set forth above, the Court **ORDERS**:

1. Defendant's motion to suppress (Doc. 75) is **DENIED**.
2. Defendant's motion to dismiss (Doc. 76) is **DENIED**.
3. The Court sets a status conference before Judge McAuliffe on February 14, 2024 at 1:00 p.m.[5]

IT IS SO ORDERED.

Dated:   **February 5, 2024**

UNITED STATES DISTRICT JUDGE

---

[4] Though counsel indicated at the hearing that the Sacramento location of the Federal Defender's Office files its *Bruen* motions in this manner—waiting until its reply to file its historical evidence—the Court has not found been able to locate even a single case in which this has occurred.

[5] The parties may stipulate to a different date with a time exclusion.